**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**HARRISON DIVISION**

**MICHELLE "MISSY" BABIN,**
**Special Administratrix of the**
**Estate of Larry Charles Babin, Jr., deceased** **PLAINTIFF**

**v.** **CASE NO. 3:24-cv-03057-DCF**

**JOHN MONTGOMERY, et al.** **DEFENDANTS**

# Exhibit A

## Deposition of John Montgomery 12-17-25

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

MICHELLE "MISSY" BABIN,
SPECIAL ADMINISTRATRIX OF THE
ESTATE OF LARRY CHARLES BABIN, JR.,
DECEASED PLAINTIFF

vs. CASE NO. 3:24-CV-03057-TLB

JOHN MONTGOMERY, ET AL. DEFENDANTS

ORAL DEPOSITION

OF

SHERIFF JOHN MONTGOMERY

(Taken December 17th, 2025 at 5:31 p.m.)

**WARNER REPORTING**

**294 OLD FERRY LANE**
**POCAHONTAS, ARKANSAS 72455**
**(870) 219-9814**





APPEARANCES

ON BEHALF OF THE PLAINTIFF:

Mr. Paul James
James & Carter, PLC
100 River Bluff Drive
Suite 420
Little Rock, Arkansas 72202

ON BEHALF OF THE DEFENDANTS BAXTER COUNTY AND EMPLOYEES:

Ms. Emily Hart
Harrington Miller
4710 South Thompson
Suite 102
Springdale, Arkansas 72764

Ms. Susan Kendall
Harrington Miller
4710 South Thompson
Suite 102
Springdale, Arkansas 72764

ON BEHALF OF THE DEFENDANTS BAXTER REGIONAL HOSPITAL; MMIC; DEE ALLEN and ERICA LIGGETT:

Mr. James Estes
Cox & Estes, PLLC
3900 Front Street
Suite 103
Fayetteville, Arkansas 72703

ON BEHALF OF THE DEFENDANTS SHERRY HILTON; JENNIFER ZAPPA; DENISE CLIFTON-JONES AND ASPEN INSURANCE U.S. SERVICES, INC.:

(VIA ZOOM)

Mr. Chris Stevens
Hall, Booth, Smith, P.C.
200 River Market Avenue
Suite 500
Little Rock, Arkansas 72201

Ms. Rylie Slone
Hall, Booth, Smith, P.C.
200 River Market Avenue
Suite 500
Little Rock, Arkansas 72201

ALSO PRESENT: Ms. Cydni Arterbury; Mr. David Roe - videographer.





INDEX

STYLE AND NUMBER . . . . . . . . . . . . . . . . . . . . . 1
APPEARANCES . . . . . . . . . . . . . . . . . . . . . . . 2
CAPTION . . . . . . . . . . . . . . . . . . . . . . . . . 4
WITNESS: Sheriff John Montgomery
Examination by Mr. James . . . . . . . . . . . . . . . 5
Examination by Ms. Kendall . . . . . . . . . . . . . 68
Further Examination by mr. James . . . . . . . . . . 69
Examination Concluded . . . . . . . . . . . . . . . . 70
COURT REPORTER'S CERTIFICATE . . . . . . . . . . . . . . . 71

* * * * * * * * * *

EXHIBITS

EXHIBIT 17 - Notice of Deposition, 2-pages . . . . . 7
EXHIBIT 18 - Genuine Care Pharmacy records for Mr. Babin, 2-pages . . . . . . . . . . . . . . . . . . . . 31
EXHIBIT 19 - Baxter County Detention Facility Policy 4.01 to 4.06, 7-pages . . . . . . . . . . . . . . . . 51
EXHIBIT 20 - Baxter County Detention Facility Policy 4.07, 3-pages . . . . . . . . . . . . . . . . . . . . 59
EXHIBIT 21 - Baxter County Jail Admin Lieutenant Job Description, 7-pages . . . . . . . . . . . . . . . . 65
EXHIBIT 22 - Baxter County Detention Facility Policies 4.08 through 4.14, 29-pages . . . . . . . . . . . . . 67

* * * * * * * * * *





CAPTION

ANSWERS AND ORAL DEPOSITION OF SHERIFF JOHN MONTGOMERY, a witness produced at the request of the Plaintiff, taken in the above-styled and numbered cause on the 17th day of December, 2025, before Marsha L. Bailey Warner, Arkansas Supreme Court Certified Court Reporter #641, at 5:31 p.m., at the Baxter County Sheriff's Department, 904 Highway 62 West, Mountain Home, Arkansas.

* * * * * * * * * *

PROCEEDINGS

VIDEOGRAPHER: We're on the record. Today's date is December 17, 2025, at approximately 5:31 p.m. Can you swear the witness?

THEREUPON,

SHERIFF JOHN MONTGOMERY,

THE WITNESS HEREINBEFORE NAMED, having been first duly cautioned and sworn by me to testify to the truth, the whole truth, and nothing but the truth, testified on his oath as follows, to-wit:

COURT REPORTER: Thank you.

EXAMINATION

BY MR. JAMES:

Q Could you tell us your name, please?

A John Montgomery.

Q Okay. And what is your address?

A I live in Cotter, Arkansas.

Q Okay. And you've given your deposition many times, correct?

A Yes, sir.

Q Okay. And do you know how many times?

A Do, I do not.

Q Okay. I'm going to mark Exhibit 17, just because we've





done it with everybody else, your Notice of Deposition.

(WHEREUPON, the document was marked for purposes of identification as Exhibit 17 and is attached hereto.)

Q And have you ever given any deposition on a case involving inmates?

A Yes.

Q Okay. And I know we've met before on another matter, but I'm talking about say an inmate that has had some type, complained of lack of medical care in the jail?

A I don't, I don't recall exactly the specifics. I mean, I've given several, so it's --

Q Okay.

A -- certainly possible.

Q Okay. First of all, you're friends of, you know the Babins, correct?

A I do know the Babins.

Q How do you know the Babins?

A Larry Babin was a fishing guide. His former father-in-law ran a fly shop. His father-in-law or former father-in-law actually served on a foundation board with myself back many, many years ago. I did know Mr. Babin, but I won't say well, but I did know him.

Q Okay. Did you know Missy Babin, his wife?

A I knew who she was and spoken to her before, but not, again, not well.





Q Have you ever talked to any of the Babins on the telephone, their son, their daughter?

A There was a son that called after Mr. Babin's death and was asking, I mean, just, really just what happened and I said it's very, you know, it's tragic; asked me if I knew if Mr. Babin had taken, had been taking medications.

Q And what did you tell him?

A And I said I don't know.

Q Did you go back and look and see when --

A I, I --

Q -- he was booked in? Excuse me. Did you go back and look when Mr. Babin, the records for when Mr. Babin was booked in to see if he had listed prescriptions?

A I did go back and I asked. I don't know that I looked, but I did call and say, ask if he had listed any medications. And I don't recall what they were, but I do recall that they, that supposedly that he had listed on that intake form that he had medications.

Q And who did you contact?

A I don't recall, sir.

Q And you just recall, do you, you, after the son called you, you called someone at the jail to see if Mr. Babin had listed any prescriptions?

A Correct.

Q And did you call the son back?





A Well, I actually did not. This was, his call to me was several days, I couldn't tell you how many, but several days after Mr. Babin's death. And at some point in there during that process of trying to inquire was notified that there had been an inquiry by your office into his death, and so at that point I did not follow-up any further with his son.

Q When, did you, the day that I inquired about Mr. Babin's death, I think I wrote a letter and asked you-all to preserve all the evidence; do you recall that?

A Well, I do now. I didn't then.

Q Who would've, who would've gotten that letter?

A Well, as I recall, looking at it afterwards, I think you actually sent that to the County Judge for some reason and not to the Sheriff's Office.

Q Okay. If I have a fax, I mean, well, we won't argue about it. But you're not saying that you didn't get a copy of that letter?

A I'm not saying that. I don't recall getting a copy.

Q What is the fax number here?

A 424-4048, I believe.

Q Okay. And what is the, the email address here?

A Well, we all have, there's a generic email address, which would just be sheriff@baxtercounty.com.

Q You heard about the, before I forget about it, you heard that one of the witnesses said that if I wanted to find out

John Montgomery 12.17.25



what the, how videos were maintained and could go back and copy them, did you, were you here when that was, that discussion was going on?
A Yes, sir.
Q Tell me how that happens?
A Well, it would depend. There's probably two or three people that would be able to pull that video. And so they would go back and pull up the record and then copy that to the disk or a thumb-drive or, or something to that effect.
Q How long is a window of opportunity to, to recapture what is on those videos?
A Well, I don't know that answer exactly.
Q Who would I need to ask?
A I don't think you could get an answer, sir.
Q Who is the company that does the recording?
A That's long gone. Those, those company, that company is long gone. We've replaced that system.
Q Okay. And I'm not, I'm not, I, I'm pretty good at tracking things down. What was the name of the company?
A At that, at that particular time, I, I'm not sure I know.
Q How would I find out who the company was that did the copies of video footage?
A Okay. Now you're going to need to rephrase your question.
Q Yes, I will. And that's, and that's fair. That was confusing. I apologize. So who was the company that you-all



use for the equipment to monitor video footage in the cells?
A And I don't know at that date and time. I know that there was an original system here back when the jail was opened in 2004. I know there was an upgrade with a company called Sygmax. And then, and then at some point after that we used EST. So I, I just don't know the dates of when one stopped and one started.
Q Would that be real easy to find out by just going back and looking at your records and when you load a check to either Sygmax or, who?
A EST is a local company.
Q Okay.
MS. KENDALL: Paul, you're welcome to go through this line of questioning. I'm not trying to, but I, I do want to tell you that we've received your good faith letter and, and this is something that we're looking into. You're welcome to go through this line of questioning --
MR. JAMES: Yeah.
MS. KENDALL: -- with him. But, but I just wanted to let you know that, that we're, we're going through this --
MR. JAMES: Yeah.
MS. KENDALL: -- exercise. We just haven't had a chance to go through it in, before today's deposition.
MR. JAMES: Yeah. Okay. Well, I, I, that's fine and that's fair. But I guess, and I don't think, given what I


John Montgomery 12.17.25



heard, that we will need to continue his deposition after you give me that information.
MS. KENDALL: Okay.
MR. JAMES: I don't, because it sounds like he's not the man that, that is in charge of that. So I don't, and I don't want to have to bother him again. But --
MS. KENDALL: Okay.
MR. JAMES: -- in the event we do get something then I would, you know, ask to continue it --
MS. KENDALL: Sure.
MR. JAMES: -- or leave it open --
MS. KENDALL: Leave it open.
MR. JAMES: -- for that purpose.
MS. KENDALL: No problem.
MR. JAMES: And I don't want, I wouldn't do it for any other reason.
Q (By Mr. James) But I guess if, yeah, I mean, you could go back actually and determine who recaptured the video that we've been looking at, January 5th, right?
A I don't know the answer to that.
Q Okay.
A I don't know if, I don't know if the system, and, again, we've changed systems. But I don't know if that system showed who actually did the download or not. I, I don't know.
Q Have you seen the email where someone from the Baxter



County Sheriff's Department emailed the Arkansas State Police asking for a copy of those footages?
A I don't think so.
Q Okay. Is it possible, well, let me, let me rephrase that. Would it refresh your recollection, did the Arkansas State Police go in and oversee that, that copying of the footage from January 5 and January 6?
A It is my understanding of that. But, of course, immediately the State Police was called in to investigate --
Q Yeah, right.
A -- the death. And so it is my understanding that, again, that investigator through, after interviewing witnesses or before --
Q Uh-huh.
A -- I don't know what came first, asked to see and get copies of different cameras and footages and so-on and so-forth of, of the, of the jail.
Q Okay. Were you consulted on that? I mean, did somebody tell you they're asking for video footage?
A I, I don't believe so.
Q So, so you just went over and talked to whoever Sebastian Dennis or whoever was a jail administrator?
A I don't know who she would've talked to.
Q Okay.
A But we certainly would've cooperated with --

Q Right.
A -- their investigation.
Q I got you. And, and I appreciate you giving that January 5th footage. Was today the first time you'd seen that?
A That's the first time I've seen it.
Q That's disturbing, isn't it?
A It is disturbing.
Q Okay. And it's disturbing because of what Larry was going through and depicted in that video, correct?
A In that, in that snapshot of time, yes, it is, it is disturbing.
Q Okay. And that's the day before he died, correct?
A I believe that's correct.
Q Okay. And I don't see any notations. Did you look at your file in any way, form, or fashion before this deposition?
A By file you mean --
Q The Baxter County Sheriff's Department file?
A No, sir.
Q I mean, Detention --
A No, I did not.
Q What did you do in preparation for this deposition.
A I looked actually at policy that we had back at that time for the jail.
Q Okay.
A And reviewed that. Of course, our, that policy has





changed since then. But I tried to go back and had it, looked at the ones that were in effect at that time.
Q Okay. Tell me which ones that you looked at?
A I believe the two that I looked at, the medical, medical policy and then the intake policy.
Q And do you have the, the medical, is it four-dash what?
A Oh, I don't know, sir.
Q Okay. Has the medical policy changed since that time?
A I don't, I don't even know if I know the answer to that.
Q So on the medical policy, what did you find significant in that?
MS. KENDALL: Object to form. You can answer.
MR. JAMES: Yeah, that's a poor question.
Q (By Mr. James) Why did you go back and look at the medical policy?
A Well, you know, truthfully, because I figured I'd get asked about it today.
Q Okay.
A So at least wanted to refresh. I'm certainly --
Q Was there anything in there that jumped out at you?
A I don't think so.
Q Okay. Was there anything relevant to this particular lawsuit, the facts of this lawsuit?
A Well, I would say yes, in, in a general answer, yes.
Q Okay. In what way, just generally?





A Well, they're talking about the medical, how the inmates would receive medical treatment. And, again, I'm paraphrasing because I don't have the policy in front of me. But what they would receive and what we would've done and medical request forms and how we would follow up and things like that.
Q Okay. When an inmate is booked in, what's the policy as to when the book-in officer takes down their medical history?
A Well, there's a medical intake form and I've not, I've not seen that, but --
Q Well, you can look at Exhibit 6 and that may help you. See if that's what you're referring to, medical intake form?
A Exhibit 6?
Q Yes. Is that the medical intake form you're talking about?
A Well, this is a medical intake form.
Q Okay. And is it the medical intake form that you just referred to? You talked about, when I said that, what's the practice or the policy when an inmate is booked in to the Baxter County Detention Facility?
A And the way I would have to answer that, this is obviously the medical intake form at the time he was booked in.
Q Yeah.
A I don't know if this is the same intake form we use today.
Q I got it. And why do you not suspect it is?
A Well, I'm not saying it's not. I'm simply saying that





this is, this is constantly being used and worked with, with the nurses, et cetera, so, and working with our attorneys in Association of Counties. And so it certainly could have been, I'm not saying it was. But it certainly could've been changed or tweaked over the years.
Q So I noticed when I looked at your inspection reports by the Criminal Detention Facility Commission, you were aware of that commission, correct?
A Yes.
Q And they make annual inspections of the jail?
A Correct.
Q And I noticed that at one point in time there was a medical doctor for the jail?
A Correct.
Q Who was that doctor?
A Joe Tullis.
Q And when Joe Tullis, did he pass away?
A No. He's still alive.
Q Okay. When did Joe Tullis quit being the doctor for the jail?
A I don't actually, and, sir, and I'm going to, I'm not sure on this, because I think the law changed. At some point you had to have a doctor oversee --
Q Uh-huh.
A -- and they had a nurse practitioner under. So if you're

asking me is Joe Tullis still over it, technically I don't know the answer to that, or if, or if it's just the nurse practitioner.
Q You don't know if Joe Tullis is a doctor for the jail as we sit here today?
A Correct.
Q Do you review the Criminal Detention Facility reports after the inspections?
A I look to see if there's any deficiencies.
Q Okay. Do you look to see what representations are made as to medical care?
A I would look and see if there's any deficiencies or recommendations.
Q Okay. Would you disagree with me at some point in time that a nurse practitioner substituted for the MD for the jail?
A That's, that's entirely possible.
Q Who does the, when you say entirely possible, that means you don't know, correct?
A That is correct.
Q You don't know how many nurses are in the jail?
A Now, or then?
Q Then.
A There was one full-time and one part-time, I believe.
Q Okay. And full-time, was that the, Sherry Hilton that we're talking about?



A Correct.
Q And she didn't work at nighttime, correct?
A That is correct.
Q And who was the part-time?
A I want to say Jennifer Zappa.
Q Okay. And, excuse me, and I keep forgetting the name. It's my mental block, hang on. Sherry Clifton-Jones?
A Denise.
MS. ARTERBURY: Denise.
Q (By Mr. James) Denise Clifton-Jones. Was she ever the on-call nurse practitioner?
A She was the nurse practitioner and she did not have any set hours but would come by the, the jail from time to time, not any particular set schedule. We would come in when requests were made to see a doctor.
Q Okay.
A And when she was not available we would either take them to one of the local clinics or to the emergency room.
Q Okay. So at one point in time you-ll had a 24-hour LPN, correct?
A No, sir. Not at all.
Q Okay. And if that's in the, okay. And if I look at your criminal, your inspections and that's what's represented, that would be incorrect?
A Well, I can tell you that's not correct.



Q Okay.
A Because we, they work, if, they work 12-hour shifts, and so they, meaning they work two on, three off, three on, two off, so that there's, if everybody is here, nobody is sick, vacation, et cetera, you would have coverage for 12 hours a day, seven days a week.
Q Okay. And sometimes though that was reduced down to eight hours a day?
A When we lost the nurse, the second nurse, the second LPN, then we only had Sherry.
Q When --
A And so we had to modify her hours to try to get the most coverage we could with one person.
Q And during the time Larry was in jail there, that was the time when there was only one LPN?
A I believe that to be correct.
Q How long had there, had you-all been without the second LPN when Larry was supposed to be in the jail?
A It was the fall. I don't, I don't know that I can tell you exactly.
Q Okay.
A But it was sometime the previous fall.
Q Okay. So the fall. He was arrested in December 30th --
A Correct.
Q -- of 2023, and so it was sometime shortly prior to his



arrest you-all lost one of your LPNs?
A Yes. I'm going to say, again, August, September, somewhere in that, that time frame.
Q Who was it you lost? Was it Sierra Hollis?
A No.
Q Who was it?
A That would've been Samuel Sparks.
Q And he was fired, correct?
A Correct.
Q And he was fired for having some type of relations with a detainee?
A Correct.
Q Did you-all advertise for a position shortly after that?
A We did.
Q And you were unable to get a nurse until when?
A Sometime, I don't even know when. I mean, but it was significantly sometime later. But we had been advertising and, and trying to find a nurse.
Q Okay. And you sign off on the annual evaluations for the employees, correct?
A Correct.
Q And you signed off for Sherry Hilton's whenever she had her raise, correct?
A That would be correct.
Q Okay. If it indicated that you gave her kudos for working

hard when you-all were short-staffed, that would be something you would review and sign, correct?

A If that's what it, if that's what it said and I agreed with that statement, the answer would be yes.

Q Okay. So you-all were short-staffed in December '23 and January 2024?

A That would be a true statement.

Q Okay. Did you-all think of any, any travel nurses to come in?

A The answer would be no. Budgets would not have allowed that to happen.

Q Oh, okay. So there was a financial component for not getting a travel nurse to make sure that you-all were fully staffed for nursing in December '23, January '24?

A And that would be a true statement.

Q Okay. There was a decision to make could you afford the nurse to cover for the nurse that had been fired?

A The salaries are set, not by me. The salaries are set by the Quorum Court. And so based upon that, trying to find a travel nurse, again, financially, we were confident it would've cost us a significant amount more because we couldn't find anybody to even work as advertised to get one hired.

Q Okay. Did you approach the Quorum Court in any way, form, or fashion to allow, get you a appropriation for someone to cover for Mr. Sparks, who had been fired?





A No, sir. Because we were trying, again, to hire a full-time --

Q I got it.

A -- LPN.

Q I got it and I understand that. But you, you're familiar with the travel nurse outfit. I think it's out of Little Rock. Have you heard of travel nurse before?

A Well, I've heard about it. Yes, sir.

Q Yeah. And you, you didn't make any effort to go to the Quorum Court and say appropriate more money so that we can get our nurse complement, the full complement, fully staffed?

A I can't answer it the way you asked it.

Q Okay. That's, that's fair, I'm sorry. So you never went to Quorum Court and said, Quorum Court, we're understaffed in terms of nursing. While we are trying to find a replacement nurse, can we have an appropriation to get someone to bring, to make a full staff?

A I did not.

Q Okay. Why not?

A I did not feel, again, that was a decision that I made, that I didn't feel like that was the best option. Our best option was to try to find a full-time nurse, which we had advertised it in several different medias trying to do that.

Q And it wasn't the best option because it cost too much to get a temporary nurse in, correct?





A I would believe that would be a correct statement.

Q And even on an interim basis, while you're looking for a, a full-time nurse to employ, you didn't consider somebody to cover that, that staff?

A I did not.

Q Okay. Fair enough. What about the nurse practitioner, did you ever, did anyone ever consider bumping her from part-time to full-time during this short staffed period of time?

A She had a full-time, she, she worked full-time at a medical clinic, so she was strictly on-call. And so I used the word on-call. She was subject to call and would come by here.

Q Okay. Tell me what the, who the medical authority is for the jail back then?

A Back then, Denise Clifton-Jones would have been the nurse practitioner.

Q Okay. So she would be what they call the health authority under the minimum standards?

A I believe that to be correct.

Q Okay. And would she write a written detoxification plan for any detainee going through the detoxification process?

A I, I don't, I don't know how, I can't answer that. I don't know whether she would've or not.

Q Okay. Does the Baxter County Detention Facility have a practice, policy, or procedure of setting forth a detoxification plans for inmates going through detoxification?





A I'm not aware of one.

Q Okay. Why do they not have a practice or policy as it relates to writing detoxification plans for inmates going through detoxification?

MS. KENDALL: Object to form. Witness can answer.

Q (By Mr. James) If you know?

A I, I don't know that I, I know the answer to that. I mean, there, they receive training as far as, you know, emergency first aid and, and those type things. But as far as individual, I, I don't, in fact, I don't know that I've, I'm not aware of them, of, of even seeing one.

Q Okay. Now you are as, I don't know if you were here in, in Jailer Brown's deposition. Were you sitting, you weren't sitting in here?

A I was not.

Q Okay. And she mentioned that, that inmates are often booked in that are under the influence of alcohol, correct?

A I'm sure.

Q That's a normal, well, you know that, right?

A Well, I'm not in the jail and see the booking, but --

Q But you know that the Baxter County jail, when they're pulling people over for public intox, for DWI and things of that nature, that's not an isolated incident?

A Oh, we do arrest folks that are booked in for alcohol related offenses.

Q Right. And, and, I mean, that's not a unusual pattern, is it?
A No, sir.
Q Okay. And as it relates to drugs and opioids, it's not an unusual pattern to have detainees coming in that are on, that are addicted to opioids, is it?
A That's correct.
Q And especially up, aren't there, I think up in the hills here aren't there lots of meth, or in the past there were meth labs and whatnot?
A Well, I don't think I've seen a meth lab in many, many years. But there's a, there, meth is certainly a drug in this area.
Q Okay. And so over the years the Baxter County Detention Facility has had inmates detained that are abusive with alcohol?
A Correct.
Q That's nothing isolated; that's something that goes on every day?
A Correct.
Q And there's detainees that, that are arrested and detained that are addicted to drugs?
A Correct.
Q And there's also another class of detainees that come in that have been prescribed medication for their health and





welfare, correct?
A Correct.
Q And so on this medical, this intake medical form that the book-in officer fills out, I think you heard Garrett Burns testify?
A Correct.
Q And they have no training in any kind of medical expertise, do they?
A No, sir.
Q Okay. So tell me, do you know is there a policy or practice that you have, or someone has implemented to make sure that intake medical form is dropped in the nurse's in-box or emailed to her or something given to her as to an inmate that has been detained that's on prescription medication?
A Well, it is my understanding that there is a policy that there's supposed to be a copy put in the nurse's, and when I say the box, I mean it's certainly entered in electronically, but they're supposed to be passed along.
Q Thank you. I think I'd seen that somewhere else and I was trying to get that. So your understanding, there's a policy that the book-in officer, when he puts down prescription medications and history of diseases and whatnot, that's supposed to be provided to the nurse?
A There, there should, I believe that to be a true statement that that's part of our policy.





Q Okay. And then the nurse, if the inmate hasn't come in with their medication, which I understand wouldn't be an isolated event either, would it?
A Some do, some don't. I don't, I don't, I don't know.
Q I take several meds and blood pressure medicine and whatnot. I don't carry it around with me. I, I would think the fair, I mean, a certain percentage of the inmates that are arrested don't have their meds with them, correct?
A I would say that would be a true statement.
Q And some of them are from families that are fractured, divorced, kids may, family may not be there that they can get them to bring the medications, correct?
A That's, that is certainly an option.
Q Okay. So the part of the reason that this intake medical form is put with the nurse is for her to follow-up on the prescription medications, diseases, and illnesses, and inmates that are under the care, a doctor's care, correct?
A Could you say that --
Q Okay.
A -- rephrase it or --
Q Part of the --
A -- say it different?
Q Yeah. Yeah, that's, yeah. Part of the reason that you have a policy, practice, and procedure at the Baxter County Detention Facility for the book-in officer to give the nurse a





copy of the intake medical form is for the nurse to follow-up on the information provided on that form?
A I would say at least to make the nurse aware. I don't know if I want to use word follow-up. I'm not sure.
Q Okay. So if someone comes in, they're on prescription medications, several prescription medications, and the nurse gets it, that's not just to make her aware that he's on prescription medications; it's also to make sure that there's follow-up, that, that the inmate gets his prescription meds, correct?
A Well, just because they said they're on that prescription, that does not mean that they are.
Q Oh. And so that's the reason they need to follow-up to, to find out, to verify them, correct?
A Typically, you're going to have an inmate, that's why that medical request form is there. So if they're, and they do, they're going to, if they have an issue or request their meds or saying they're on a particular medication that they may not have listed on that form, then they'll follow-up on that medical request form.
Q Okay. Well, an inmate, I mean, an inmate can't be, a detainee can't all the time be their own doctor. You would agree with me, correct?
MS. KENDALL: Object to form.
A I'm not sure I can answer it the way you asked it, but

I'll, if you'd like to rephrase it, I'll try.
Q (By Mr. James) No, I'm just saying if, you're not going to rely on the inmate to tell you-all when he needs his medication, correct?
A I would say that's an important part of it. Yes, sir.
Q Right. But part of it is if they list the medication it's for the nurse to check into that, correct?
A Again, that's to make the nurse aware. I, I don't know that I --
Q Okay.
A -- would say that.
Q Okay. Let me, if a nurse is in the Baxter County jail and they show up at 8:00 in the morning, the first thing she's, or one of the things she's supposed to do is go over, look at the intake medical forms. That's part of her job, correct?
A That would be part of their, if, if, if they've been given to her, yes.
Q Yes. And, and it says intake medical form, so that would at least imply to me that someone with some medical expertise is going to review that form?
A I don't know that I, I'm not sure I'm understanding what you're asking.
Q Well, okay. The guy that works at McDonald's and Wal-Mart and The Home Depot, he doesn't have the experience to evaluate what's included on this intake medical form, does he?



A No, sir.
Q So that would be something that you would expect the nurse to review and follow-up on?
A Correct.
Q Okay. That didn't happen in Larry Babin's case, did it?
A I don't know.
Q Did Larry Babin, did you look at his medical file and his Guardian file to see that he was not given any medications from December 30th all the way and to his death?
A I did not.
Q Would that alarm you that he didn't get his medications between December 30th and January 6th?
A It would alarm me, if he indeed was on medication. It would, it would cause me concern. Yes.
Q Okay. I'm going to show you what's marked as Exhibit Number 18. I have copies.
(WHEREUPON, the document was marked for purposes of identification as Exhibit 18 and is attached hereto.)
Q Are you familiar with Genuine Pharmacy?
A I am.
Q And is that a reputable pharmacy here in Mountain Home?
A It's in Gassville. Yes, sir.
Q Gassville, okay. And that's where the Babin's lived, right?
A Well, I know, I don't know about Larry Babin. The Babin



family lived in Cotter --
Q Okay.
A -- which is just down the road.
Q Yeah. Yeah.
MR. JAMES: What exhibit was that?
COURT REPORTER: 18.
Q (By Mr. James) In that Exhibit 18, that medication history there would in essence confirm that Larry Babin was on medications, it looks like, at the time he was booked in, correct?
MS. KENDALL: Object to form. Witness can answer.
MR. JAMES: Where's the date.
A I'm actually having trouble finding the date, which column? Sorry.
Q (By Mr. James) That's just what I asked. I've seen it before but --
A Oh, I found the date, sorry. I found the column, my apologies. Well --
Q Because it looked to me like, on 12/1/2023, he filled a prescription at the Genuine Care Pharmacy, correct?
A I'm not seeing that.
Q On the very top, see that his blood pressure medicine, the second one is --
A Oh.
Q Yeah.



A I apologize, sir.
Q Yeah.
A I found it.
Q Yeah, okay. It appears like he has been taking the medication, correct?
MS. KENDALL: Object to form. Witness may answer.
A I didn't --
Q (By Mr. James) Well, I see --
A Rephrase the question.
Q Okay. Well, let's look down, Gabapentin, quantity 90?
A I don't even know what that is.
Q Well, okay. But that is confirmation that when Larry gave medications that the pharmacy, that it's documentation he was on medication, correct?
MS. KENDALL: Object to form.
A According to this form, it appears that prescriptions were filled under his name.
Q (By Mr. James) Okay. And so once, he lists his diseases, neuropathy, terminal cancer, asthma, high blood pressure, those are something you'd want to look into, correct?
A Correct.
Q You wouldn't want him to discontinue his blood pressure medicine abruptly, would you?
A I'm not a doctor. I don't know the answer to that.
Q Okay. Well, I take blood pressure medicine and I can tell

you my wife can answer that. But if, if, you would want the nurse to evaluate that, correct? Somebody, a medical professional?
A I would agree.
Q And that wasn't done with Larry Babin, was it?
A I don't know how to, I don't know the answer.
Q Okay. Why don't we look at his medical file. I think that was, oh, well, that's 6, that same 6. You're familiar with Guardian, correct?
A Correct.
Q Look at the second page of, or the third page. It says inmate medication, Baxter County jail, what is, that page is blank, correct?
A Correct.
Q Inmate medication history, Baxter County jail is blank, correct?
A Correct.
Q The inmate medication, Baxter County jail, the next page is blank, correct?
A Correct.
Q That indicates that he wasn't given any of his medications from December 30 until he died or even ever given them while he was a detainee at the Baxter County jail?
A That's what this forms looks like, yes.
Q For an entire week, correct?



A If that's what this form looks like. Yes, sir.
Q And you knew, personally knew that, that Larry Babin was an alcoholic, didn't you?
A That's not --
MS. KENDALL: Object to form.
MR. JAMES: Okay. I'm asking --
MS. KENDALL: Witness can answer.
MR. JAMES: Yeah.
THE WITNESS: Yeah, that's not correct.
MR. JAMES: I didn't ask him about -- I'm just asking if he knew or not. If he says no --
THE WITNESS: No, I did not know.
MR. JAMES: Okay. He answered the question.
Q (By Mr. James) Have you looked at his, his criminal history?
A No. By criminal history, are you talking about his intake or his actual, because criminal history is not necessarily a jail intake --
Q Okay. Have you ever looked to see how many times Larry Babin has been arrested for alcohol related offenses?
A I have not looked.
Q Do you recall when he ran through the gas station, that year, through the middle of a gas station up in Salesville?
A I remember hearing about it after it happened. Yes, sir.
Q In fact, it was all over the newspaper, wasn't it?



A Could be. I don't --
Q Okay.
A I know I heard about it. Yes, sir.
Q You knew it was Larry Babin and he was drunk and he drove his car through a grocery store up there in Salesville?
A Well, I don't use the word drunk, but he was intoxicated or at least he was arrested for such.
Q Okay. And that was just six months before he was arrested on this particular offense, correct?
A He, yeah, I don't believe he was arrested on this particular offense.
Q How did he get --
A I think it was a contempt of court, I believe. The Judge issued him a contempt of court citation.
Q Okay. And, no, he, on December 30th, you're not aware that he was arrested for driving and drinking?
A I'm not aware. Again, I thought that was a contempt, but I'm --
Q Okay.
A -- I'm not, that's best I recall.
Q And I think he was charged with DWI-3, I believe?
A I don't know.
Q Okay. So if an inmate presents as being arrested by the Arkansas State Police for driving while intoxicated, where is that inmate supposed to be housed?



A If they were arrested in Baxter County, they would be housed here at the Baxter County Detention Center.
Q Yeah. And where within the Baxter County Detention Facility would they be assigned if they come in when they have been charged with DWI?
A Well, there's, there's a lot of possibilities. It depends on their intoxication level. There's, if they're, normal, as far as being able to speak and conduct themselves normally, they would probably go, probably go back in the general population.
Q You're talking about after somebody is arrested for DWI?
A Sure.
Q Even when they refuse a test and you don't know what the alcohol level is?
A Correct.
Q And you wouldn't consider, it's not the policy, well, scratch that. Are they sometimes put in a detox cell?
A Certainly.
Q Okay. And they're sometimes put in a detox cell when they're going through withdrawal also, correct?
A That would be, it would be my assumption. Yes, sir.
Q Okay. And, once again, that's for observation?
A Correct.
Q Tell me what you know about withdrawal just personally?
A Well, I don't know anything personally about withdrawal.

Q No, I don't mean yourself. I'm just saying I think, are you familiar with studies by the Department of Justice about the problems of withdrawal and treatment of inmates going through withdrawal in jails?
A I am not aware of any study. No, sir.
Q Okay. You are aware that, once again, that, that the jail does arrest folks on a common basis that, that are, do have problems with alcohol and drugs?
A The answer is yes. And if I might follow-up?
Q Oh, you're fine. Yeah, follow-up.
A Just because they've been arrested for an alcohol offense does not make them an alcoholic.
Q Oh, I, I get that. Hopefully, it doesn't. So the, the, but a certain percentage of people that are arrested for DWI, especially repeat arrests for DWI, are a possibility that they're alcoholic, correct?
MS. KENDALL: Object to form. Calls for speculation. Witness can answer.
A I couldn't answer that question.
Q (By Mr. James) Okay, well, okay, scratch. What do you as the Sheriff, what policy has been made to help the jailers identify inmates who are going through alcohol withdrawal?
A I'm not aware we've made any policy.
Q What, as Sheriff, what policies have you implemented for those going through withdrawal from some type of substance,



like opioids, for instance?
A I'm not aware of any policy.
Q Who is the policy maker for the Baxter County Detention Facility?
A I am.
Q And the Chief Jail Administrator, he's not the one that implements policy? He's not the one that promulgates policy?
A Correct.
Q Okay. That's the Sheriff?
A That's correct.
Q Buck stops with you?
A Correct.
Q Okay. And you've never felt the need to promulgate a policy for the Baxter County Detention Facility to address alcohol withdrawal?
A No, sir.
Q And you've never seen a need as the Sheriff of Baxter County to promulgate policy as it relates to any other substance abuse policy?
A Say that, re, say that again, so I understand --
Q You don't have, you don't have, you haven't seen a need to promulgate a policy for someone in, a detainee of the Baxter County Detention Facility that has an abrupt cessation of some type of medication or illegal drug?
MS. KENDALL: Object to the form.



MR. JAMES: Okay.
MS. KENDALL: Witness can answer.
A I don't know of a need for a specific policy. Again, part of the, the training, whether it's, you know, substance abuse or alcohol or mental abuse, again, the, we want to make sure that those detainees are taken care of and monitored, protected, medicated, fed, clothed, et cetera. I mean, that's part of, part of that. But as far as needing a specific policy, I don't, I don't know that I agree with that. I don't know that it's necessary.
Q (By Mr. James) Okay. So you've chosen not to promulgate a policy to deal with alcohol withdrawal in the Baxter County jail?
MS. KENDALL: Object to form. Witness can answer.
A That would be a correct statement.
Q (By Mr. James) And let's go to prescription medications. For, you have made a decision not to promulgate a policy for those that have an abrupt cessation of their prescription meds?
A Say that slightly different --
Q Okay.
A -- on that.
Q We have opioids and illegal, maybe illegal drugs?
A Correct.
Q I'm not asking you about prescription medication. You understand that some people could be on prescription medication



and you can't stop it cold-turkey, correct?
MS. KENDALL: Object to form. Witness may answer.
A That would be, a doctor would have to make that, that decision, not --
Q (By Mr. James) So is, okay. As a layperson, you don't understand that someone that's on prescription medication for a time-being and has a abrupt cessation that that could have adverse effects?
A Oh, I believe it could.
Q Okay. And you don't have a policy to, for the jailers to identify that issue?
A No, sir. They're not medical staff. They're not medically trained.
Q Okay. So you expect them to look at symptoms and tell the jail nurse?
A That is correct.
Q But you don't have a written policy for them to --
A No, sir.
Q And they're not trained in that regard, any way, form, or fashion?
A No, sir.
MS. KENDALL: Object, I didn't hear the question. I'm sorry. Could you --
MR. JAMES: I said they're not trained in that regard in any way, form, or fashion.

MS. KENDALL: Object to form. You can answer.
A That is correct.
Q (By Mr. James) Okay. Are you familiar with a lawsuit that was filed by Tammy Christine Hanson, in 2010, complaining about not getting her meds?
A Yes, I am.
Q Okay. And she complained that, about not getting her medications for thyroid, a thyroid condition?
A I know that was part of her lawsuit claim was she's not getting meds, I don't. I don't recall specifically.
Q Do you recall that, in that lawsuit she alleged that the cessation of her medicine caused her problems?
A I don't recall that specific --
Q Okay. But do you want, I've got a copy if you'd like to --
A I remember the case very well.
Q Okay.
A But --
Q Okay. But you remember it was some kind of case where she was complaining about not getting her medication?
A That was her complaint.
Q Okay. And do you recall a case from, just filed in 2025, of a Zachary Lee Zelk?
A Yes, sir.
Q And do you, and that was in, filed in, it appears in 2025?



A Correct.
Q And is Mr. Zelk complaining about not getting his medication?
A I believe, if I'm not, I believe it was suboxone. I think that's what he was complaining about.
Q Okay.
A Oh, I'm very familiar with that.
Q Yeah. And he, he was not given his suboxone by the jail staff, correct? Or he's, that's his complaint?
A That's his complaint.
Q Okay. Okay. And are you familiar with a case called Tracy Standridge versus Sheriff John Montgomery, in 2014?
A I know Mr. Standridge or knew him. He's deceased now.
Q So how did you know him?
A He's just been in and out of our jail many times.
Q Okay. And did he complain about not getting his meds in 2014?
A I don't know the answer to that.
Q Okay. What about a Darren Lee Norman, do you know him?
A I do not.
Q Okay. You don't recall having a lawsuit in, wow, Judge Wright's court, Susan Weber Wright, in August of 2017?
A I do not.
Q What about a Tony Griffin, do you recall that one?
A I do not.



Q Okay. What about a Steven Gauger?
A I --
Q G-A, I may butchering it, G-A-U-G-E-R?
A I don't, I don't, I don't think so.
Q Okay. What about an Amber Lee Renaud?
A No.
Q Okay. And what about a Cody Hastings?
A No, sir.
Q And what about a William Smith?
A Yes, sir.
Q Tell me about William Smith?
A He was in our jail. The lawsuit, as I remember, had to do with a use of force.
Q Okay. This isn't the first time that, that Baxter County Detention Facility has been sued for a failure to get prescribed medications, is it?
MS. KENDALL: Object to form. The witness can answer.
A Is it the first time we've been accused of, of doing that?
Q (By Mr. James) No. Being, a lawsuit filed against you?
MS. KENDALL: Same objection. Witness can answer.
A Well, there have certainly been lawsuits, but that doesn't mean they've been proven.
Q (By Mr. James) Okay. But I mean it's not an isolated incident if someone sues you-all for not getting their



prescription meds in the jail?
A That's correct.
Q And it's not, that's not a pattern that you'd be unfamiliar with? You, you're familiar that inmates file lawsuits over not getting their medications?
A That has happened. Yes, sir.
Q Okay. And it's not an isolated event that --
MS. KENDALL: Object, go on. Sorry.
Q (By Mr. James) -- that inmates complain about not getting their prescription medications?
MS. KENDALL: Object to form. Witness can answer.
A Certainly, they complain.
Q (By Mr. James) Okay. And it's happened more than once?
A That they've complained?
Q Yes.
A Well, yes.
Q Okay. It's an, it's an ongoing problem from the inmates' perspective?
MS. KENDALL: Object to form. Witness can answer.
A Yeah. Well, first of all, just because they complain or just because they file a lawsuit does not mean that those facts were correct.
Q (By Mr. James) Okay.
A And I'm going to give you two examples.
Q Okay.

A Number one, Tammy Hanson, a jury decided that was not true.
Q Okay.
A Number two, Zac Zelk, I happen to know for a fact that's not true. And I know that case has not been settled, but I signed off and had to pay for us to pay for his suboxone.
Q Okay.
A So I know that not, that case not to be factual. Now that's the two I remember.
Q Okay. Let me ask you this: do you know that inmates that come to Baxter County Detention Facility and are detained here are entitled to get their prescription meds, if it's properly prescribed by a doctor?
A Correct.
Q Okay. And you've known that for a long time?
A Yes, sir.
Q And you've known it from the first time you got into the sheriff business, correct?
A Correct.
Q When were you elected Sheriff?
A 2004.
Q Okay. So you've been for twenty, going on 21 years?
A Just finished 21, sir.
Q Yes, yes. You mentioned that that video footage of Larry Babin on January 5th was disturbing. How was it disturbing?



A Well, again, that snapshot of the video showed him to be acting, I would say, not normal. Not being there and being there in person to see it, it's kind of hard to say exactly. But just looking at that video certainly I would say that he was needing some assistance.
Q Okay. And you understand that the snapshot --
MR. JAMES: That was a video for how long?
MS. ARTERBURY: Almost an hour.
Q (By Mr. James) An hour long. Do you understand that? We just took clips, we --
A Yes, sir.
Q Okay. So did, did you have any video footage for January 4th?
A I, I don't know the answer to that.
Q Okay. Did you save any video footage from January 4th?
A I, I don't know the answer to that.
Q Okay. Did you see anywhere in that medical file where a nurse had ever followed up on the medical intake form with Larry Babin?
A I did not see any, any documentation.
Q Okay. An inmate gets booked in, well, let's just say they don't have anything on their medical intake form. Is there a procedure for the nurse just to check them out on a, maybe a weekly basis or after they're booked in?
A If they request to see a nurse, certainly, we would



follow-up.
Q Okay. And there is no policy, practice or procedure by the nurse to periodically check in on inmates unless there's a medical request form?
A I don't know the answer to that, sir.
Q Okay. When, does the nurse ever do an independent intake medical form?
A I don't know the answer to that.
Q Maybe yes, maybe no?
A I don't know.
Q Tell me what the nurse's job duties and responsibilities are, best of your knowledge?
A They're to dispense medications; they are to, certainly any first-aid, anything like that. They would be there for consultation with a jailer, if, if there was questions that the jailer might have. And they would most likely arrange, if there was doctors appointments outside the, the area, the facility that needed to be done, they would most likely be the one to, to do that.
Q Whose responsibility is it to review the intake medical form after the jailer takes out the, down the information?
A Say it, say it again, please.
Q Whose responsibility is it to review the intake medical form after the jailer takes down that information?
A Well, a copy is supposed to go to the nurse. And I say, I



mean, that's, that's what the policy and procedure states, that a copy is supposed to go to the nurse. And then at that point the, I would say the supervisor on duty would again be responsible for monitoring those inmates during the time that they're there.
Q You heard me ask both Garrett Burns and Sergeant, former Sergeant Due whether, about one of their job description was to follow-up on the inmate's medical piece?
A Correct.
Q Can you tell me how in the world that person follows up on the medical need if they don't go to that medical intake form?
A You're asking me to speculate?
Q No. I'm just asking you how, if, if, if part of the job description is to, is to take care of the detainee's medical needs, how do they do that if they don't go and look at the intake medical form?
A Oh, I would think there, there's more than one way to, to make sure the inmate is being medically cared for.
Q Okay. And I --
MR. JAMES: Do we have copies of this?
MS. ARTERBURY: It's Exhibit 7, so it's already been --
Q (By Mr. James) Okay. Medical, the jail nurse job description, has that been introduced? Seven.
A Seven?

Q Okay.
A No. Oh, that's 17, sorry.
Q Is that the jail nurse?
A Yeah. Yes, sir.
Q Okay. Under paragraph number 2 what does it say?
A Contact inmate's previous healthcare providers for a medical regime verification.
Q Okay.
A Or regimen.
Q In this case, on the intake form there's a Dr. Michael Hagaman. You know Dr. Hagaman?
A I do.
Q Good guy, isn't he?
A Yes, sir.
Q Okay. And is there anything in the record that the jail nurse followed up with Dr. Hagaman to make sure that Charles Babin doesn't have cancer?
A I do not know. I know that's part of our policy that the nurse is supposed to do that.
Q Okay. And if Dr., he was, if Dr. Babin, Larry Babin was under the care of Dr. Hagaman, you would've expected the nurse to contact Dr. Hagaman?
A That's part of their job description.
MR. JAMES: Is there just one of these?
MS. ARTERBURY: No, I've got more.



MR. JAMES: Okay. Exhibit what now?
COURT REPORTER: 19.
Q (By Mr. James) This is Exhibit 19.
(WHEREUPON, the document was marked for purposes of identification as Exhibit 19 and is attached hereto.)
Q You mentioned earlier that I may be quizzing you about the policies, and you reviewed some of the policies?
A Correct.
Q I assume you reviewed this 4.01?
A Yes, sir.
Q And you're the one that promulgated this policy?
A Correct.
Q And it says related Arkansas Jail Standards?
A Correct.
Q And that's 10.-1001?
A Correct.
Q Okay. And under paragraph 1 it says Baxter County Office and, Sheriff's Office and Detention Center, as authorized by the governing body, shall provide inmate medical and healthcare needs, medical personnel who are duly licensed by the State of Arkansas. There will be two licensed practical nurses who are employed full-time and who maintain an office and present inside the confines of the detention center when working and on duty.
Is that, was that a policy that, was that implemented or



promulgated by you?
A Correct.
Q Okay. And we've already discussed that we didn't have two full-time licensed practical nurses when Larry Babin got, was booked into jail?
A Correct.
Q And we've discussed that enough, I think. So it says one of the LPNs will be scheduled to work each day of the week; is that correct?
A Correct.
Q There will be an additional part-time LPN to fill in as needed. Who was the part-time LPN at the time Larry Babin was booked into jail?
A I believe that was Jennifer Zappa.
Q Okay.
A I'm saying that with just a little hesitancy, but I think --
Q Okay.
A -- that's correct.
Q And who is Sierra Hollis?
A Sierra was a, was a full-time nurse at one time.
Q Okay. And was she fired?
A She, I don't know. I don't remember --
Q Okay.
A -- to be honest with you.



Q Okay. She's no longer employed?
A She's no longer employed.
Q Okay. Well, you haven't talked to her in a long time?
A No, sir.
Q Did you ever have any disagreements with her?
A Yeah, yes. I mean, there was, she was trying to set her own hours at some point, back years ago, and we, that wasn't going to work that way.
Q Okay. Then the next line of the policy says there will also be two Advance Practice Registered Nurses, APRNs, or equivalent, who will work on a part-time basis and who shall regularly be available in person at the detention center and to see jail inmates a minimum of two times per week; did I get that correct?
A That is what that says. Yes, sir.
Q Okay. So that doesn't say go see the inmates two times a week, when they do a medical request. It just says a minimum of two times per week, correct?
A That's correct.
Q Okay. And then Baxter Regional Medical Center shall be utilized for emergency care; did I read that correctly?
A Yes, sir.
Q Then the next one is what puzzles me. BRMC and/or Boston Mountain Rural Health Clinic will be utilized for services and procedures that are deemed necessary by a licensed medical, by

licensed medical personnel that are not available at the detention facility; is that correct?
A Correct.
Q And Boston Regional Medical Center had a contract with the jail, correct?
A Boston Mountain.
Q Yeah. I don't know why I keep saying that. Boston Mountain Rural Health had, Clinic had a contract?
A Correct.
Q And they were available to, were contracted to help with the medical delivery in the Baxter County Detention Facility, correct?
A As I recall, we all, I don't think they ever came here; I think we always had to transport the inmate to their facility.
Q Okay. They, they do have a facility right here in Mountain Home, right?
A Correct.
Q So how far is it from --
A From here?
Q Yes.
A Probably a mile at the most.
Q Okay. So the, the Boston Mountain Rural Health Clinic is one mile away. How far is the, is the hospital from here?
A Be about the same distance.
Q Okay. Did anybody from Boston Mountain Rural Health ever



provide any input on how the jail should operate its medical care delivery to the detainees?
A I'm not aware of any input from them. No, sir.
Q Did they ever come to the jail and look and observe and see how things were run?
A Not that I'm aware of.
Q Why not?
A Well, again, we would take the inmate to them. But they had, they, they basically had pretty strict rules and you had to call ahead of time and make an appointment, which is why most of the time if we had any type of situation like that we would take them to the emergency room, because we could walk right in the door with the hospital.
Q Should I rely on the contract on what Boston is supposed to, Boston Mountain is supposed to do for the Baxter County Detention Facility?
A Repeat that.
Q Could I go review the contract and that would tell me what they're contracted to do?
A Yeah, I'm, I'm, yes.
Q Okay. On paragraph 2 of that, under specific procedures, it says at the time an inmate is booked in the jailer performing the booking procedure should ask a series of basic medical questions to determine, among other things, whether inmate has any injuries, is under the care of a physician, has



any communicable disease, and is taking any medications prescribed by a licensed healthcare professional.
Did I read that correctly?
A Yes, sir.
Q And then the next sentence, the answer to those questions will be fully annotated in the booking file for a later review by supervisory personnel and/or licensed medical personnel providing services to the detention center. Additional medical questions may be asked, as necessary.
Do you, does your, do you have any knowledge of anybody, any supervisory employee of the Baxter County Detention Facility or any licensed healthcare professional reviewing this Exhibit 6 inmate medical form?
A I can tell you that's a policy, that it should've been done.
Q Okay. And that would give you some concern if it was not done?
A Yes, sir.
Q Okay, okay. Under paragraph 11, it says, it says during such times and hours that an LPN is not working and on duty jail staff will contact the APRN for situations in which consultation with a licensed medical care professional is needed for inmate medical or healthcare issues; did I read that correctly?
A Yes, sir.



Q And you heard that the APRN was not contacted for Larry Babin?
A That's what I heard.
Q And that would be in violation of policy, correct?
A That's --
MS. KENDALL: Object to form. The witness may answer.
THE WITNESS: Sorry.
A That would be in violation of policy.
Q (By Mr. James) Okay, okay. In, under paragraph 16, inmates with prescription medications will be given those medications in the manner indicated on the prescription; did I read that correctly?
A Yes, sir.
Q And if Larry Babin wasn't given his prescription medications, that would be a violation of policy, correct?
A Say that, would you say that one more time just --
Q If Larry Babin was not given his prescription medications, that would be a violation of policy?
A Yes, sir.
Q Okay. Then, under Specific Procedures on, the Bates stamp is 366, I don't know how many pages down --
A I'm not sure where you're at, sir.
Q Okay. At the bottom there's a 366 on the right-hand corner.

A Oh, okay.
Q Specific Procedures is where I am, that's easier found.
A Okay.
Q It says the only prescription medications that will be provided and dispensed to jail mates are those that have been duly and lawfully prescribed by qualified medical personnel. All medications dispensed shall be logged in the Guardian inmate tracking system.
So if Larry Babin's prescriptions were prescribed by Dr. Hagaman, they should have been given to him between December 30th and January 6th?
A That is correct.
Q And if they weren't, that was a violation of policy?
A That is correct.
Q So I see on policy 4.07, is that still part of the Baxter County Sheriff's Department policy, on the next, if you continue on, at the bottom right it says 370.
A I don't think I have a 370. I have a 369.
Q Okay. Is it in --
A I have a 369.
Q Okay. Mine has a 370.
MR. JAMES: Does yours have a 370?
MS. ARTERBURY: They've been stapled. They're separate. They're separate.
MR. JAMES: Oh, okay.





Q (By Mr. James) Okay, I'm sorry. Somebody stapled it inadvertently. Did you review a policy relating to mental healthcare delivery services?
A Is --
Q No, I'm, I'm, did you review what --
A Oh, I'm sorry.
Q I'm just asking you now, we're going to get a copy.
A I'd have to see it.
Q Oh, okay, sorry. Hang on. And then we'll make this --
COURT REPORTER: 20:
Q (By Mr. James) -- Exhibit Number 20.
(WHEREUPON, the document was marked for purposes of identification as Exhibit 20 and is attached hereto.)
Q Are you familiar with 4.07?
A Yes. Well, give me just a second to read it. I've not seen this in a long time.
Q You're familiar with Ozark Guidance Centers; is that correct?
A Yeah, and I'm not sure they're still called guidance centers, but, yes, yes.
Q Community Mental Health Center?
A Yes. Yes, sir.
Q And Community Mental Health Centers have the responsibility to come into the jail and counsel or evaluate folks that have psychological issues, correct?





A That is correct.
Q And that's something that doesn't cost the jail a nickel, does it?
A For them to come in, no.
Q Okay. So I understand if there's a prescription or something that, or some other, some other referral then that would cost, correct?
A Correct.
Q But it doesn't cost Baxter County Regional one nickel to have the Ozark or whoever the community mental health centers, whatever the name is, to come in and evaluate the inmates?
A Baxter Regional?
Q No. Ozark --
A Oh.
Q Whoever the, let me ask. The community mental health service that services Baxter County will come in for free and evaluate the detainees for psychological problems?
A That's correct.
Q And you understand alcohol withdrawal to be a psychological problem?
MS. KENDALL: Object to form. Witness may answer.
A I would, I would say yes.
Q (By Mr. James) Okay. Well, you, you don't know if it's classified as a DSM, yeah, okay. But --
A No, sir.





Q Your guess would be that it is a psychological issue?
A I would, I would, my guess --
MR. KENDALL: Object to form. Witness may answer.
MR. JAMES: Okay.
A If it's, I would say it seems the answer would be yes.
Q (By Mr. James) Okay. And you've heard the testimony that if by inmate, or even somewhat by the jailers that Larry Babin was acting abnormal?
A Yes.
Q Okay. And that was something you would, you could've got the guidance center to come for free, to come evaluate?
A That's correct.
Q Okay. And in fact that's part of your policy, correct?
A Correct.
Q And if they didn't call the community mental health centers, acting abnormal, that would be another violation of policy --
A That's correct.
Q -- correct?
A That's correct.
Q Okay. And he was acting abnormal by January 3rd, correct?
A I don't know when he, well, it's not, I'm sorry. Say it again.
Q I think the testimony that maybe on the night of January 2nd was the first indication he was acting abnormal, correct?

MS. KENDALL: Object to form. Witness may answer.
Q (By Mr. James) You may not remember.
A I don't remember. I'm sorry.
Q You remember when he was moved down on January 3rd?
A Correct.
Q And part of the reason he was moved down is inmates wanted him out of his cell?
A Correct.
Q And the inmates can testify about the behavior and what they told Officers Blake and Due, but even Blake and Due did acknowledge some abnormal behavior and is the reason they moved him.
MS. KENDALL: Is that a question? If so, I'm going to object to the form of it.
MR. JAMES: Yes.
MS. KENDALL: Objection to form. Witness may answer.
MR. JAMES: Okay.
Q (By Mr. James) Was part of the reason that Blake and Due moved Larry Babin out of F-pod was due to complaints of abnormal behavior?
A That's what I heard.
Q Okay. And if he was acting abnormally, this is something that the community mental health service, pursuant to policy 4.07, could have, have come and evaluated?
A You're saying the word could have.



Q Well, they, they, it's in Baxter County and it's part of their catchment area, the jail, correct?
A Correct.
Q And you-all have had people from the community mental health center come out and evaluate folks before?
A Correct.
Q And you have them evaluated because of psychological issues?
A Correct.
Q And some of that may be withdrawal issues?
A Certainly.
Q And that's something that's not out of the ordinary?
A Correct.
Q In fact, it's, according to policy, it should happen?
A Correct.
Q And if he's acting abnormal, Larry Babin should have been seen by the community mental health center?
MS. KENDALL: Object to form. Witness can answer.
A You're asking me to speculate. I'm not a doctor.
Q (By Mr. James) Okay. And that's why I guess the jailers have to consult with medical personnel, like an APRN, even if it's after-hours, correct?
A I'm trying to answer it the way you're asking, but I'm not sure I can.
Q Okay. January 3rd, he was moved in part because of



abnormal behavior in F-pod?
A Correct.
Q And if he's displaying abnormal behavior and refuses to go to the doctor when he has a head injury and doesn't know where he is, you would want that inmate evaluated by the community mental health center?
MS. KENDALL: Object to form. Witness can answer.
A I would say that would be a reasonable, reasonable response.
Q (By Mr. James) Okay. A mental health issue can be a serious medical need, correct?
A Yes, sir.
Q And when you have a mental health issue, that's why you had this policy in place on October 4, 2019, for the, the staff to contact the community mental health center to evaluate potential mental health problems?
A Correct.
Q Okay. Thank you.
MS. KENDALL: I'd like to take about a five-minute break, unless --
MR. JAMES: Yeah. And I'm about to --
MS. KENDALL: -- unless you're getting close.
MR. JAMES: Let's take a five-minute break and then I'll know. I probably will be close.
MS. KENDALL: Okay, great, thanks.



VIDEOGRAPHER: We're off at 6:50.
(WHEREUPON, after a break the proceedings resumed as follows, to-wit:)
VIDEOGRAPHER: We're back on.
MR. JAMES: Okay.
Q (By Mr. James) I haven't asked you, I don't think, about the role of a Chief Jail Administrator.
MR. JAMES: Did I just give you-all that? Oh, here they are.
Q (By Mr. James) I'm going to show you what's marked as 21.
(WHEREUPON, the document was marked for purposes of identification as Exhibit 21 and is attached hereto.)
Q Tell me, just even without looking at this, as a practical matter, just day-to-day what the relationship is between you and the Chief Jail Administrator, Sebastian Dennis, during this time?
A During this time? Okay, they run the day-to-day operations of the jail.
Q Okay.
A And they are expected to follow policies and procedures. And then would ask for assistance if there was some decisions that needed to be made that might be outside of the normal scope of their duties. Or maybe to inform myself or my, well, my Chief Deputy of events or things that might happen that they felt like we might need to know about.

Q Okay. Do you meet with him on a daily basis, weekly basis, or what?
A It's typically a, it's a weekly basis, because we have a weekly staff meeting.
Q Okay.
A And it could be more often, just depends on situation and circumstances.
Q And it's my understanding you eventually fired Sebastian Dennis?
A That is correct.
Q And he was using funds of Baxter County for, that weren't appropriate?
A No. He was fired for untruthfulness.
Q Okay. And he was having a relationship with another employee in the Baxter County Detention Center?
A That had been alleged.
Q Okay. And I think you wrote a letter saying there, where witnesses that saw him coming out of a hotel room where they were --
A Correct.
Q And they were eating What-A-Burgers from Searcy?
A Correct.
Q And using the, your Sheriff's Department's credit card to do that?
A The Deputy had, yes.





Q Okay. That someone said that he was, came out of the room with?
A That's correct.
Q And you said he was untruthful because of what?
A Because he told me that he didn't.
Q Okay. So when was he fired?
A I, I don't know the date. I'm sorry.
Q Was it after, it was, I know it was after Larry Babin date. Was it shortly after his death?
A Honestly, I don't know.
Q Okay. Okay. And I guess did Tabitha Maze replace him?
A Correct.
MR. JAMES: Okay. One last exhibit. We have just one. I think this was provided by, is this for me?
Q (By Mr. James) This is Exhibit Number 22.
(WHEREUPON, the document was marked for purposes of identification as Exhibit 22 and is attached hereto.)
Q Have you seen this 4.08 before? Have you seen the 4-point, oh, you don't have it. Exhibit Number 22 that's policy number 4.08, have you seen that policy before?
A I don't recall seeing it before.
Q Okay. And maybe because it says Joe H. Edmonds, Chair, toward the bottom. Was he your predecessor?
A Correct.
Q Okay. And these were provided in discovery by I think the





nail, jail nurses' attorneys.
A Okay.
Q And could you tell me, under Specific Procedures it says jail officers will be instructed in the basic jail certification to detect signs, symptoms, and effects of severe alcohol and drug intoxication, correct?
A If you'll give me just a second, sir, I'd like to read this real quick. Okay. Now --
Q Yes.
A -- I'm sorry. What was your question?
Q Is that, you're not familiar with this policy? And it may have been replaced by another policy, if you --
A I don't know.
MR. JAMES: Okay. I'll get into that later, but I appreciate it. And that's all the questions that I have.
MR. ESTES: I'll reserve my questions.
MS. KENDALL: Chris?
MR. STEVENS: I have no questions.
VIDEOGRAPHER: Okay.
MS. KENDALL: I just have one brief question.

EXAMINATION

BY MS. KENDALL:
Q Sheriff, earlier, Mr. James went through a series of questions about whether that you had promulgated policies with respect to physical manifestations of, or symptoms caused by





alcohol or substance abuse issues. And you indicated that you did not have one specific to alcohol or substance abuse, medical issues caused by alcohol or substance abuse issues. Is there a policy at Baxter County that you have promulgated that, that addresses medical issues caused by substance abuse or alcohol withdrawal that may not be specific to substance abuse or alcohol withdrawal symptoms?
A I think our medical policy covers that. Again, I think that, I mean, I do, I think that covers, covers that without having a specific policy.
MS. KENDALL: Okay. I don't have any further questions.

FURTHER EXAMINATION

BY MR. JAMES:
Q You are familiar with the Minimum Jail Standards, correct?
A Yes, sir.
Q And your, the policy of the Baxter County Sheriff's Department is to comply with those jail minimum standards --
A Correct.
Q -- as it relates to detoxification also?
A Correct.
MR. JAMES: Thank you. That's all I have.
VIDEOGRAPHER: Is that it? We're off at 7:08.
(THEREUPON, the proceedings in the matter were suspended at 7:08 p.m.)

John Montgomery 12.17.25



(WITNESS EXCUSED)

* * * * * * * * * *



CERTIFICATE

STATE OF ARKANSAS )
)ss
COUNTY OF RANDOLPH )

I, MARSHA L. BAILEY WARNER, Certified Court Reporter #641 and Notary Public, do hereby certify that the facts stated by me in the caption on the foregoing proceedings are true; and that the foregoing proceedings were reported verbatim through the use of the voice-writing method and thereafter transcribed by me or under my direct supervision to the best of my ability, taken at the time and place set out on the caption hereto.

I FURTHER CERTIFY, that I am not a relative or employee of any attorney or employed by the parties hereto, nor financially interested or otherwise, in the outcome of this action, and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, that requires me to relinquish control of an original deposition transcript or copies of the transcript before it is certified and delivered to the custodial attorney, or that requires me to provide any service not made available to all parties to the action.

WITNESS MY HAND AND SEAL this 2nd day of February, 2026.

Marsha L. Bailey Warner
Certified Court Reporter #641
My Commission Expires: August 22, 2033

**Marsha L. Bailey Warner**
Certification #641
Arkansas Supreme Court
Certified Court Reporter